## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALARMAX DISTRIBUTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:22-cv-01597 |
| | ) | |
| vs. | ) | Chief Judge Cathy Bissoon |
| | ) | |
| RESIDEO TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this lawsuit, Plaintiff, AlarMax Distributors, Inc. ("AlarMax" or "Plaintiff"), seeks a declaratory judgment that Defendant Resideo Technologies, Inc. ("Resideo") is bound by the 2004 Settlement Agreement ("2004 Agreement") between Honeywell International Inc. ("Honeywell") and AlarMax.  (Doc. 1).  Having conducted a two-day Bench Trial on April 28-29, 2025, the Court hereby rules as follows:

### The Parties

1.     AlarMax is wholesale distributor of electronic fire and security products for residential and commercial settings with its principal office located in Pittsburgh.  (Doc. 133, Joint Stipulation of Uncontested Fact ("Joint Stip.") ¶ 1).

2.     Electronic fire and security products include, without limitation, fire alarms, burglar alarms, closed circuit television (CCTV), access control, intercoms, structured cabling, and peripheral closely related products.  (Joint Stip. ¶ 2).

3.     ADI Global Distribution ("ADI") was formerly an unincorporated business unit of Honeywell.  (Joint Stip. ¶ 3).

1

4.    Under Honeywell's ownership, ADI distributed electronic fire and security products for residential and commercial settings.  (Joint Stip. ¶ 4).

5.    In Honeywell's Information Statement filed with the Securities and Exchange Commission (Exhibit 99.1) in connection with the spin-off of Resideo (hereinafter "Exhibit 99.1 Information Statement"), Honeywell represented that ADI was the leading wholesale distributor of security products, with over 200 stocking locations in 17 countries.  (Joint Stip. ¶ 5).

6.    In the Exhibit 99.1 Information Statement, Honeywell disclosed that it was spinning off ADI into HH Spinco Inc. (later known as Resideo).  (Joint Stip. ¶ 6).

7.    After Honeywell completed its spin-off of Resideo in the fall of 2018, which included the ADI business, ADI then became a business segment of Resideo.  (Joint Stip. ¶ 7).

8.    Following the spin-off, ADI was no longer a business segment of Honeywell.  (Joint Stip. ¶ 8).

9.    Following the Spin-off, Resideo existed independently of Honeywell with its own leadership structure and mix of shareholders. Trial Transcript ("Tr.") 4/29/25 at 17:20-18:1 (Gorman); Tr. 4/28/25 at 52:8-53:9 (Hall).

10.    Honeywell continues to operate and perform its applicable obligations under the 2004 Agreement.  See, e.g., Tr. 4/28/25 at 55:3-6.

11.    Honeywell now is just another third-party vendor of ADI that transacts with ADI at arms-length.  ADI does not receive any special pricing from Honeywell because it formerly was part of Honeywell.  Tr. 4/29/25 at 84:6-18 (Cardazzi).

### The 2004 Settlement Agreement

12.    On or about April 19, 2004, AlarMax sent to Honeywell a letter and draft Complaint, which alleged that Honeywell has violated and was continuing to violate certain

laws of the United States of America and had engaged and was continuing to engage in other unlawful conduct in violation of the laws of the Commonwealth of Pennsylvania.  (Joint Stip. ¶ 9).

13.    Before AlarMax filed its Complaint, AlarMax and Honeywell settled their dispute and executed a Settlement Agreement and Release, which attached a Supply agreement to be separately executed, both dated September 20, 2004 (collectively, the "2004 Agreement"). (Joint Stip. ¶ 10).

14.    The name "Resideo" does not appear in the 2004 Agreement, and Resideo did not exist at the time of the 2004 Agreement.  (Joint Stip. ¶ 11).

15.    The first Whereas clause of the 2004 Agreement states that "Honeywell is engaged in the business of manufacturing and distributing Electronic Fire and Security Products."  The second Whereas clause of the 2004 Agreement states that "AlarMax is engaged in the business of distributing Electronic Fire and Security Products."  (Joint Stip. ¶ 12).

16.    Section 2.a of the 2004 Agreement defines "Honeywell" as "Honeywell International Inc., its directors, officers, agents, affiliates, predecessors, parent companies, subsidiaries, successors and assigns.["]  (Joint Stip. ¶ 13).

17.    Section 5(a) of the 2004 Agreement states, in relevant part, that "[t]he terms and conditions (including without limitation pricing) of any sales by Honeywell to AlarMax shall be competitive and shall not commercially disadvantage AlarMax vis-a-vis other distributors (such as ADI) in which Honeywell has an economic interest[.]"  (Joint Stip. ¶ 14).

18.    Section 5(b) of the 2004 Agreement states that "Honeywell shall not induce or knowingly accept more favorable price or payment terms, as compared to AlarMax, from non-Honeywell manufacturers.  Honeywell shall not knowingly induce non-Honeywell

manufacturers, or sellers, of Electronic Fire and Security Products to provide more favorable prices to Honeywell for Electronic Fire and Security Products to be sold unaltered in distribution with the understanding that such prices will be provided exclusively to Honeywell or with the understanding that Honeywell will receive a lower price than AlarMax receives from that manufacturer or seller. Nothing in this paragraph will preclude Honeywell from seeking lower prices from any supplier as long as Honeywell does not request that such pricing be exclusive to Honeywell." (Joint Stip. ¶ 15).

19. Section 5(c) of the 2004 Agreement states that "Honeywell shall not enter into exclusive sale or distribution agreements, or otherwise suggest, encourage or coerce exclusive dealings, with non- Honeywell manufacturers, except that Honeywell may enter exclusive joint or co-development agreements or arrangements for the development and sale of products not previously offered for sale to third parties by Honeywell or the other party to such joint development agreement or arrangement and Honeywell may enter such agreements with respect to products sold in Non-Relevant Channels. In the event that AlarMax is told by a non-Honeywell manufacturer that Honeywell has an exclusive sale or distribution agreement with that manufacturer, Honeywell agrees to provide a representation letter to such manufacturer, with a copy to AlarMax, in the form attached hereto as Attachment B." (Joint Stip. ¶ 16).

20. Section 5(d) of the 2004 Agreement states that "Honeywell shall not facilitate, encourage, or coerce non-Honeywell manufacturers to boycott AlarMax." (Joint Stip. ¶ 17).

21. Section 20 of the 2004 Settlement Agreement provides that "[t]his Release shall be binding upon, and be for the benefit of, Honeywell and AlarMax and their successors and assigns." (Joint Stip. ¶ 18).

22. The 2004 Agreement does not specifically identify the name of any AlarMax or

Honeywell successor or assign.  (Joint Stip. ¶ 19).

23.    The first and second Whereas clauses of the separately-executed Attachment "A" Supply Agreement to the 2004 Agreement states that Honeywell and AlarMax are "settling claims and disputes between them" as set forth in the 2004 Agreement, and that, as part of such settlement, Honeywell and AlarMax are entering into the Attachment "A" Supply Agreement. (Joint Stip. ¶ 20).

24.    The "Supply Agreement" to the 2004 Agreement generally requires Honeywell to make specified products available to AlarMax.  (Joint Stip. ¶ 21).

25.    The 2004 Agreement is governed by Pennsylvania law.  (Joint Stip. ¶ 22).

## The 2014 Litigation

26.    On November 6, 2014, AlarMax filed suit against Honeywell in the United States District Court for the Western District of Pennsylvania at Case No. 2:14-cv-01527-DSC-MPK (the "2014 Litigation").  (Joint Stip. ¶ 23).

27.    In that litigation, AlarMax alleged that Honeywell, including through ADI, breached the 2004 Agreement and violated the Robinson-Patman Act as a result of Honeywell/ADI inducing or knowingly accepting unfair and anticompetitive net pricing and terms from vendors of electronic fire and security products on an exclusive basis.  (Joint Stip. ¶ 24).

28.    Specifically, AlarMax alleged that Honeywell/ADI was inducing or knowingly accepting, on an exclusive basis or with the understanding that they would receive, net pricing from non-Honeywell vendors of electronic fire and security products lower than that extended to AlarMax through Honeywell/ADI's use of a 2011 ADI Vendor Agreement.  (Joint Stip. ¶ 25; Pl. Ex. 5).

29.     Section 1.2 of the 2011 ADI Vendor Agreement states in relevant part that the "Vendor shall provide sufficient quantities of Products to ADI at its lowest price (including incentives, rebates and other offers) and longest payment terms then-available to similarly situated customers in similar regions purchasing similar quantities of Product on similar terms to satisfy all purchase orders submitted to it by ADI."  (Joint Stip. ¶ 26; Pl. Ex. 5).

30.     Section 3.2 of the 2011 ADI Vendor Agreement states that "Vendor shall provide a rebate equal to five percent (5%) of ADI's monthly purchases of Products (less returns)."  (Joint Stip. ¶ 27; P. Ex. 5).

31.     On May 4, 2015, in a ruling on Honeywell's Motion to Dismiss, Magistrate Judge Maureen P. Kelly interpreted language in the 2011 ADI Vendor Agreement to require "an additional 5% discount from the lowest price offered to" similarly-situated customers.  (Joint Stip. ¶ 28).

32.     Referencing AlarMax's Complaint, Judge Kelly noted that "[t]he electronic fire and security products distributed by AlarMax and ADI are manufactured by Honeywell" (among other companies) and that "AlarMax and ADI are direct competitors in the United States[.]"  (Joint Stip. ¶ 29).

33.     In this same ruling, Judge Kelly opined that ADI's use of the 2011 ADI Vendor Agreement constituted a breach by Honeywell of Section 5(b) of the 2004 Agreement.  (Joint Stip. ¶ 30).

34.     Judge Kelly also determined that Honeywell's use of the 2011 ADI Vendor Agreement precluded Honeywell's motion to dismiss AlarMax's Robinson-Patman claim, stating as follows:

> AlarMax has alleged repeatedly that Honeywell has "knowingly induced discriminatory prices."  Its strongest support for this assertion once again comes

from the 2011 ADI Vendor Agreement. By entering into this agreement with a given vendor, Honeywell would be assured of better pricing from that vendor to the detriment of all of its competitors, including AlarMax. There is also no indication that vendors could benefit from any of the applicable defenses to offering such illegal pricing to Honeywell. Therefore, it is reasonable to infer that, by employing the 2011 ADI Vendor Agreement, Honeywell induced, and then received pricing it knew was illegally discriminatory to AlarMax, among others. (AlarMax v. Honeywell, Case No. 2:14-cv-01527, Report and Recommendation, ECF 28, at 26- 27 (W.D. Pa. May 4, 2015) (internal citations omitted).

(Joint Stip. ¶ 31).

35.   Judge David S. Cercone adopted Judge Kelly's Report and Recommendation as the opinion of the Court. (Joint Stip. ¶ 32).

36.   In a Report and Recommendation on the summary judgment motion filed by Honeywell, Judge Kelly determined that the Court's ruling on the Motion to Dismiss, particularly as to Section 5(b) of the 2004 Agreement, constituted the law of the case "[b]ecause th[e] Court interpreted the unambiguous language of the 2011 ADI Vendor Agreement as a matter of law[.]" (Joint Stip. ¶ 33).

37.   Judge Kelly thus reaffirmed the Court's prior holding "that Honeywell's use of a contract like the 2011 ADI Vendor Agreement is a breach of Section 5(b)[.]" (Joint Stip. ¶ 34).

38.   Judge Kelly further held that Honeywell's defense of functional availability to the Robinson-Patman Act violation failed because, under Honeywell' s ADI Vendor Agreement, "ADI is entitled to an exclusive discount from vendors" that is not available to AlarMax or others. (Joint Stip. ¶ 35).

39.   Judge Cercone adopted Judge Kelly's Report and Recommendation as the opinion of the Court. (Joint Stip. ¶ 36).

40.   In the midst of the 2014 Litigation, Honeywell completed its spin-off of Resideo on October 29, 2018. (Joint Stip. ¶ 37).

41.     As part of the spin-off, Honeywell and Resideo agreed to jointly manage the 2014

Litigation.  (Joint Stip. ¶ 38).

### The 2019 Settlement Agreement

42.     Ultimately, Honeywell, Resideo, and AlarMax entered into a Settlement

Agreement, effective November 13, 2019 ("2019 Agreement").  (Joint Stip. ¶ 39; Pl. Ex. 6).

43.     By November 13, 2019, Honeywell had completed the spin-off of Resideo, and

the ADI business was no longer part of Honeywell.  (Joint Stip. ¶ 40).

44.     Section 3 of the 2019 Settlement Agreement specifically reaffirms the 2004

Agreement:

> **The 2004 Settlement Agreement and the 2004 Supply Agreement**. Honeywell and
> AlarMax agree that the 2004 Settlement Agreement and the 2004 Supply Agreement
> remain in place with their terms continuing.  Resideo and AlarMax disagree as to
> whether and to what extent the 2004 Agreements apply to Resideo, and Resideo and
> AlarMax each reserve, without waiving, their respective rights regarding the
> applicability of the 2004 Agreements to Resideo.  Nothing in this Agreement modifies
> the terms of the 2004 Agreement.

(Joint Stip. ¶ 41; Pl. Ex. 6).

45.     The 2019 Agreement states in Section 4, entitled "Covenant Not to Sue and

Tolling Agreement," that for a three-year period from the Effective Date, Honeywell, AlarMax

and Resideo would not initiate a lawsuit arising out of the 2004 Settlement Agreement.  (Joint

Stip. ¶ 42; Pl. Ex. 6).

46.     On November 14, 2022, exactly three years from the Effective Date of the 2019

Agreement, AlarMax initiated the instant lawsuit.  (Doc. 1).

47.     The 2019 Agreement states in Section 6, entitled "Overlapping Vendor Letter"

that "Within ten (10) business days from the Effective Date of this Agreement, Resideo shall

direct ADI to send, and ADI shall send a letter in the form attached hereto as Exhibit A (without

adding or subtracting content) to the sales manager on the account, for the following fifteen (15) overlapping vendors, which AlarMax represents to the best of its knowledge, based upon reasonable review of relevant records, to be its top fifteen (15) overlapping vendors with ADI (excluding UTC and Honeywell) for the period 2018-2019: Aiphone, Assa Abloy, Bosch, Cooper Wheelock, Dormakaba, Exacq, Gentex, Hikvision, Keri Systems, Legrand, Nortek, George Risk Industries, Potter Electric, Power Sonic and Telular.  Resideo shall provide written confirmation to AlarMax that said letters have been sent within three (3) days after the letters are sent."  (Joint Stip. ¶ 43; Pl. Ex. 6).

48.    Section 6 of the 2019 Settlement Agreement obligated Resideo (and not Honeywell) to provide written confirmation to AlarMax that the overlapping vendor letter had been sent within three (3) days after the letter is sent.  (Joint Stip. ¶ 44; Pl. Ex. 6).

49.    Resideo's 30(b)(6) deponent and trial witness in the current litigation, Marco Cardazzi, signed the overlapping vendor letters that Resideo was required to send out under Section 6 of the 2019 Settlement Agreement.  (Joint Stip. ¶ 45).

50.    These letters to the 15 overlapping vendors, all dated November 21, 2019, were sent on ADI letterhead from ADI's headquarters in Melville, NY, indicating that ADI was "a Resideo company."  (Joint Stip. ¶ 46).

51.    The 2019 Agreement states in Section 7 entitled "Vendor Exclusivity Letter," that "If a vendor of electronic security products communicates to AlarMax the vendor's belief that ADI requires the vendor to provide net pricing to ADI on an exclusive basis, then Resideo, at the written request of AlarMax, shall direct ADI to send, and ADI shall send, a letter to that vendor (to the vendor contact person specified by AlarMax), in the form attached hereto as Exhibit B (without adding or subtracting content) within five (5) business days from AlarMax's

written request.  Resideo shall provide written confirmation to AlarMax that said letter has been sent within three (3) days after the letter is sent.  Resideo agrees that, after AlarMax receives such confirmation, AlarMax can advise the relevant vendor that the vendor will be getting a letter from Resideo (ADI) and state the substance of that letter (as set forth in Exhibit "B")."  (Joint Stip. ¶ 47).

52.    In connection with the spin, ADI sent an announcement to its vendors that purchased electronic fire and security products from ADI, stating as follows: "[a]s you have most likely heard, this morning Honeywell announced plans to refine its portfolio and spin off its Homes and ADI Global Distribution business into a separate, standalone, publicly traded company," and that "[y]our relationship with ADI is unaffected by this change.  More notably, it's important to underscore that ADI will continue function as a fully independent organization within the new Homes business once it is established.   The company anticipates that it will take one year to complete the spinoff.   Until then, it remains business as usual."  (Joint Stip. ¶ 48).

53.    The announcement further provided that "ADI has built a strong legacy in partnering with vendors and suppliers over the past 25 years, and we fully intend to continue to maintain and build on those relationships."  (Joint Stip. ¶ 49).

54.    As part of the spin-off, ADI in June 2018 also emailed a subset of its vendors which transacted with ADI pursuant to an agreement requiring consent to assign with an update on the upcoming "Homes" spin-off of the ADI Global Distribution business and attached a document entitled "Assignment of the ADI Vendor Agreement," (the "Assignment Request"). (Joint Stip. ¶ 50).

55.    The Assignment Request requested the vendor's consent to the assignment of its ADI Vendor Agreement by and between Honeywell.  (Joint Stip. ¶ 51).

56.     The Assignment Request concluded by stating: "We appreciate your assistance with this transition and request that you return a countersigned copy of this letter before July 13, 2018.  If we do not receive your letter by such date, we will assume you have consented to the transactions."  (Joint Stip. ¶ 52).

57.     In April 2018, Honeywell incorporated a subsidiary for the spin-off transaction, referred to as "SpinCo" in the relevant documents, and later renamed it Resideo.  (Joint Stip. ¶ 53).

58.     On October 29, 2018, Honeywell completed its spin-off of Resideo.  (Joint Stip. ¶ 54).

59.     On the date of spin-off, October 29, 2018, Honeywell distributed the stock of Resideo Technologies Inc. in a 1:6 ratio, *pro rata*, to its public shareholders.  (Joint Stip. ¶ 55).

60.     As part of the spin-off, Honeywell and Resideo entered into a Separation and Distribution Agreement.  (Joint Stip. ¶ 56).

61.     Schedule XXIV of the 2018 Separation and Distribution Agreement, titled "Jointly Managed Actions," discloses the AlarMax v. Honeywell litigation.  (Joint Stip. ¶ 57).

62.     During discovery, AlarMax requested the production of ADI Vendor Agreements for 96 overlapping vendors that appeared on Exhibit A to Plaintiffs First Set of Requests for Production of Documents Directed to Defendant Resideo Technologies, Inc., operative from October 10, 2017 (pre-spin) until the present (post-spin).  (Joint Stip. ¶ 58).

63.     AlarMax corporate-designee Randy Hall testified that AlarMax "run[s] into ADI more frequently" than any other distributor.  (Joint Stip. ¶ 59).

### Expert Opinion Testimony of Katie Gilden

64.     To quantify the object of litigation for purposes of establishing federal diversity

jurisdiction, AlarMax retained an expert in accounting/forensic accounting, Katie Gilden, to review the data and analyze the differentials in pricing and rebates that Resideo receives under Sections 1.2 and 3.2 of the 2011 ADI Vendor Agreement and which AlarMax does not receive. Pl. Br. at 9-10; Tr. 4/28/25 at 141:25-143:9, 142:24-144:8 (Gilden); Ex. D-98.

65.     Ms. Gilden concluded that AlarMax suffered financial "harm" in excess of $75,000 for the period of 2019 through 2023 based on a sampling of 23 overlapping vendors. Tr. 4/28 at 157:3-16, 162:18-163:17, 165:13-20 (Gilden) & Ex. D-98.

66.     Ms. Gilden has no expertise in cases involving the sale or distribution of electronic fire and security products.  Tr. 4/28 at 159:3-19 (Gilden).

67.     Ms. Gilden did not speak with anyone at AlarMax during the course of her work preparing her expert opinion.  Tr. 4/28 at 161:1-8. (Gilden).

68.     Ms. Gilden did not opine that ADI or Resideo was causing any vendor to give ADI a better deal than AlarMax.  Tr. 4/28 at 164:4-6 (Gilden).

69.     Ms. Gilden did not ascribe any improper, illegitimate or inappropriate activity on the part of ADI to account for the pricing differential.  Tr. 4/28 at 165:21-24 (Gilden).

70.     Ms. Gilden "did not undertake to determine the reason behind the discount or the classification of the discount."  Tr. 4/28 at 163:3-5 (Gilden).

71.     Ms. Gilden acknowledged that there could be legitimate marketplace reasons why a vendor might give a higher rebate to one distributor if that distributor is providing more services for the vendor than another distributor, but Ms. Gilden did not analyze whether ADI and AlarMax had comparative levels of vendor service.  Tr. 4/28 at 163:20-23, 164:7-165:1, 168:23-169:1 (Gilden).

72.     Ms. Gilden acknowledged that there would be nothing illegitimate about a

vendor giving ADI a higher rebate percentage because ADI performed valuable services that AlarMax did not provide.  Tr. 4/28 at 165:2-7 (Gilden).

73.    Ms. Gilden did not look to see if any pricing differentials qualified as volume discounts or seasonal discounts or functional discounts.  4/28 at 166:4-15 (Gilden).

74.    Ms. Gilden acknowledged that credit rating or credit history could impact the early payment discount terms a vendor was prepared to offer a distributor.  Ms. Gilden did not consider that variable.  Tr. 4/28 at 169:2-11 (Gilden).

75.    Ms. Gilden admitted that there were a number of reasons why a vendor might give a higher percentage rebate to a distributor.  Ms. Gilden acknowledged that a distributor's ability to grow the business or sales or marketing services could be the basis for functional discounts that a vendor could give to one distributor but not another.  Tr. 4/28 at 169:12-25 (Gilden).

76.    Ms. Gilden's report provides that "[f]unctional discounts occur where a buyer is permitted to purchase a product at a lower price per unit than another buyer because of the advantageous marketing function which the favored buyer performs for the seller.  In other words, the buyer renders services to the seller and receives a price discount in return."  Tr. 4/28 at 170:10-17 (Gilden).

77.    Ms. Gilden agreed that a seller might give a higher rebate percentage to a distributor that was performing services, like marketing initiatives, that were valuable to the seller. Tr. 4/28 at 170:18:22 (Gilden).

78.    Ms. Gilden did not analyze whether ADI received any functional discounts for services provided to a vendor that might explain any difference in pricing terms between ADI and AlarMax.  Tr. 4/28 at 170:23-171:9 (Gilden).

79.     Ms. Gilden did not take into account the amounts that ADI is spending to provide unique services to a vendor when calculating AlarMax's potential lost reductions because of differences in a vendor's pricing terms.  Tr. 4/28 at 173:12-175:5 (Gilden).

80.     Ms. Gilden did not consider the benefits ADI afforded to vendors or how much additional marginal expense ADI incurred to provide that extra benefit to the vendor.  Tr. 4/28 at 175:6-12 (Gilden).

81.     Ms. Gilden acknowledged that testimony at trial established that ADI provided a number of differential services to vendors that AlarMax did not provide.  Ms. Gilden did not subtract out the money ADI spent to provide all of those services to its vendor partners in rendering her "financial harm" analysis.   Tr. 4/28 at 172:15-173:16 (Gilden).

82.     When comparing gross profits, Ms. Gilden assumed that ADI and AlarMax were paying the same base prices for products, but she did not confirm that the base prices were, in fact, equal.  Tr. 4/28 at 207:17-208:18 (Gilden).

83.     Ms. Gilden did not analyze whether ADI and AlarMax were purchasing the same products from a given overlapping vendor.  Tr. 4/28 at 208:19-210:7 (Gilden).

84.     Ms. Gilden acknowledges that ADI's usage of the 2011 Vendor Agreement does not consistently result in ADI obtaining more favorable pricing than AlarMax because some overlapping vendors have given lower overall pricing to AlarMax than to ADI – namely, Black & Decker, George Risk Industries, Nortek/Linear, and Yale Residential.  Tr. 4/28 at 203:16-204:1, 204:13-20, 205:9-16, 205:17-206:8, 206:9 -18 (Gilden).

**ADI Has Amended the Language in Section 1.2 of Any Overlapping Vendor Agreements**

85.     The ADI Vendor Agreement, to the extent it was in circulation in 2023 with any of the 96 overlapping vendors AlarMax has identified in litigation, has been revised with

language further clarifying that ADI does not request or require exclusive low prices. Section 1.2 now reads, in relevant part:

> To the extent permitted by applicable law, Vendor agrees that the net price for Products sold to ADI shall, on a non-exclusive basis, be at least as favorable as the net price for Products sold to distributors on similar terms. "Net price" shall mean the price paid after any discounts, incentives or rebates, including any rebate provided in Section 3.2.

Ex. D-11 at RTI_00002782.

86.     Exhibit D-10 was the template for all letters to overlapping vendors proposing amending the language of Section 1.2 of the ADI vendor agreement. It provides "[w]e have updated section 1.2 of our standard vendor agreement to remove any potential ambiguity and to clarify we are not requiring pricing in the aggregate (including discounts, incentives and rebates) that is more favorable than pricing you offer to similarly situated customers purchasing on similar terms." Tr. 4/29 at 112:17-113:18 (Cardazzi); Ex. D-10.

87.     Letters using the D-10 template were sent by ADI to all relevant overlapping vendors whose vendor agreements with ADI still contained the original Section 1.2 language. Tr. 4/29 at 113:19-25 (Cardazzi); Ex. D-10.

88.     Exhibit D-11 was the template that was used for amending section 1.2 of the ADI vendor agreements, which further clarified that ADI was not seeking exclusive low pricing from its overlapping vendor partners. The amendments to section 1.2 were sent to all overlapping vendors. Mr. Cardazzi testified that there are currently no overlapping vendor agreements that contain the original section 1.2 language from the 2011 ADI Vendor Agreement. Tr. 4/29 at 113:13-116:4 (Cardazzi); Exhs. D-11, D-12 through D-61, D-100.

89.     The motivation for ADI amending the pricing sections of the ADI agreements is that, due to AlarMax's continued complaints regarding the use of the 2011 ADI Vendor Agreement in the current litigation, "in the interests of being absolutely clear and not having

any issue," ADI took a number of actions – including, "to the extent those agreements hadn't already been amended or the new language utilized, [ADI] would amend the provisions at issue in all of [its] overlapping vendor agreements and send notifications, again, indicating how the agreement is intended to work in practice and how [it] in fact worked in practice." Tr. 4/29 at 172:13-18 (Foster).

90.    Mr. Foster's team at Resideo was responsible for amending the pricing sections of the ADI vendor agreements, and he was directly involved in this effort. Tr. 4/29 at 172:19-5 (Foster).

91.    As of the time of trial, all existing ADI vendor agreements with overlapping vendors that had contained the challenged language of Section 1.2 were amended to clarify expressly that the section did not require any exclusive low pricing. Tr. 4/29 at 172:19-173:19 (Foster); Exhs. D-12 through D-61, D-100.

92.    Mr. Cardazzi confirmed that, to his knowledge, there were no remaining overlapping vendor agreements that contain the former Section 1.2 language. Tr. 4/29 at 116:1-4 (Cardazzi).

93.    These amendments of the pricing provisions of ADI vendor agreements necessarily number fewer than the 96 overlapping vendors identified by AlarMax due to several factors including that (a) not every overlapping vendor agreement had the Section 1.2 language in question; and (b) certain agreements lacked Section 3.2 rebate language. Tr. 4/29 at 173:6-19 (Foster).

94.    Other factors include that certain vendors, like Seco-larm Alarm, have been inactivated and are no longer ADI Vendors. Tr. 4/29 at 125:22-24 (Cardazzi). Still other vendors had consolidated with existing vendors to unify under a single agreement, such as Alula (which

includes ipDatatel and Uplink) and Legrand. These new agreements have revised Section 1.2
language. Tr. 4/29 at 173:20-174:9 (Foster); Ex. D-100.

## II.  CONCLUSIONS OF LAW

1.      A declaratory judgment is not warranted in this action because AlarMax has failed
to demonstrate an actual case or controversy.

2.      The Declaratory Judgment Act "requires an actual controversy between the
parties before a federal court may exercise jurisdiction." 28 U.S.C. § 2201(a).

3.      A plaintiff bringing an action for declaratory judgment must prove, by a
preponderance of the evidence, that an actual controversy exists.  Edmunds Holding Co. v.
Autobytel Inc., 598 F. Supp.2d 606, 609 (D. Del. 2009).

4.      "An actual controversy exists where the facts alleged, under all the circumstances,
show that there is a substantial controversy, between parties having adverse legal interests, of
sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Edmunds
Holding Co., 598 F. Supp.2d at 609 (citing Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S.
270, 273 (1941)); see also, e.g., Jersey Cent. Power & Light Co. v. State of N.J., 772 F.2d 35,
40–41 (3d Cir. 1985) ("The availability of declaratory relief will not always satisfy the
constitutional requirement that the case or controversy be susceptible to judicial resolution; the
concreteness of the factual situation and the adversity of the parties must remain considerations. .
. . [W]e are not persuaded that sufficient adversity remains as to this claim for relief, most
notably due to the plaintiff's contention that this claim is moot."); SB Pharmco Puerto Rico, Inc.
v. Mut. Pharm. Co., 552 F. Supp. 2d 500, 511 (E.D. Pa. 2007) ("[T]he Supreme Court articulated
the test for jurisdiction in declaratory judgment actions: '[W]hether the facts alleged, under all
the circumstances, show that there is a substantial controversy, between parties having adverse

legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment'" (quoting <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118 (2007))); <u>Cunnane v. Subers</u>, No. CIV. A. 92-4844, 1993 WL 134774, at *2 (E.D. Pa. Apr. 27, 1993) (citing cases and noting that the controversy must accrue with "sufficient immediacy and reality" between parties with adverse legal interests, such that the litigant can show "a threat of future harm").

5.    Here, AlarMax has not met its burden to make credible allegations showing that a substantial controversy exists.  At most, AlarMax has shown only a theoretical disagreement regarding the 2004 Agreement and its progeny.  Moreover, any theoretical dispute has become moot due to the revision of Section 1.2 in ADI's vendor agreements with all overlapping vendors, such that the basis for AlarMax's concern about Resideo allegedly breaching the 2004 Agreement no longer credibly exists.  Nor can AlarMax point to a past history of breach by Resideo.  *See* FOF ¶¶ 85-94.

6.    Essentially, a controversy exists only in the mind of AlarMax.  This Court declines to opine on whether Resideo is currently bound by the 2004 Agreement where AlarMax has not demonstrated any current, ongoing or threatened breach of the 2004 Agreement by Resideo, even if Resideo were deemed to be bound.

7.    AlarMax's reliance on cases such as <u>Korvettes, Inc. v. Brous</u>, 617 F.2d 1021 (3d Cir. 1980), as support for their contrary position is misplaced.  In <u>Korvettes, Inc.</u>, the Court of Appeals found a "definite and concrete" disagreement between the parties that "was real and ripe for judicial review," where "the parties were engaged in negotiations over the termination of [appellee's] employment which could not proceed without resolution of the issues in dispute[.]" 617 F.2d at 1023.  The Court of Appeals agreed with the lower court, however, that the litigants did not satisfy the "actual controversy" requirement with respect to another part of the agreement

where their dispute with respect that part became "moot prior to judicial resolution," due to the appellant's promises regarding that contractual portion. *See* id.

8.  AlarMax additionally has failed to demonstrate an amount in controversy in excess of $75,000, and, thus, has not satisfied the requisite federal jurisdictional standards.

9.  Jurisdiction in this case is based on 28 U.S.C. § 1332, requiring diversity of citizenship.   For a district court to have original jurisdiction in a diversity case, the opposing parties must be citizens of different states and the amount in controversy must exceed $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a); Correspondent Servs. Corp. v. First Equities Corp. of Fla., 442 F.3d 767, 769 (2d Cir. 2006).

10.  The party asserting jurisdiction bears the burden of demonstrating that the district court has the power to hear the case.  Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1044–45 (3d Cir.1993); *see also* Kaufman v. Liberty Mut. Ins. Co., 245 F.2d 918, 920 (3d Cir. 1957) ("The party asserting [federal jurisdiction] has the burden of proving all the jurisdictional prerequisites.  When a general allegation is denied, he must offer competent proof in support of his claim.").

11.  Resideo disputes that AlarMax has satisfied the amount in controversy requirement.  Once a defendant challenges a plaintiff's allegations regarding the amount in controversy, the plaintiff must produce sufficient evidence to justify its claims by a preponderance of the evidence.  Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d Cir.1995).

12.  To justify dismissal, it must appear to a legal certainty that plaintiff's claim is for less than the statutory amount.  St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283,

288–89 (1938).  "Legal certainty," however, does not require absolute certainty.  <u>Nelson v. Keefer</u>, 451 F.2d 289 n.6 (3d Cir.1971).

13.　　In a declaratory judgment action, the amount in controversy is "measured by the value of the object of the litigation."  <u>Nationwide Mut. Ins. Co. v. Brown</u>, 387 F. Supp. 2d 497, 498 (W.D. Pa. 2005) (citing <u>Jeffrey Press, Inc. v. Hartford Cas. Ins. Co.</u>, 326 F. Supp. 2d 626, 628 (E.D.Pa.2004)), <u>aff'd</u>, 226 F. App'x 153 (3d Cir. 2007).

14.　　"The temporal focus of the court's evaluation [regarding the amount in controversy] is on the time that the complaint was filed."  <u>Auto-Owners Ins. Co. v. Stevens & Ricci Inc.</u>, 835 F.3d 388, 395-96 (3d Cir. 2016) (citations omitted).

15.　　"Subsequent events cannot reduce the amount in controversy so as to deprive the district court of jurisdiction, nor can later events increase the amount in controversy and give rise to jurisdiction that did not properly exist at the time of the complaint's filing."  <u>Id</u>. at 395-96 (citation omitted).

16.　　AlarMax defines the "object of the litigation" as "resolution of a dispute about whether Resideo is bound by the 2004 Agreement [between AlarMax and Honeywell]."  Pl. Br. at 9.  If bound, the 2004 Agreement would prohibit Resideo from inducing or knowingly accepting more favorable price or payment terms than AlarMax from vendors of electronic fire and security products on an exclusive basis or with the understanding that Resideo will receive a lower price than AlarMax receives.  2004 Agreement ¶ 5(b).  Nothing in the referenced subsection, however, would preclude Resideo from seeking lower prices from any supplier as long as Resideo did not request that such pricing be exclusive to Resideo.  <u>Id</u>.

17.　　AlarMax cites only the testimony and report of expert Katie Gilden as prove that this lawsuit satisfies the threshold amount in controversy.  Pl. Br. at 9-10.  Ms. Gilden's

testimony and opinions, however, are insufficient proof on this point because, *inter alia*, they show at best that some overlapping vendors extend lower net pricing terms (including rebates and early payment discounts) to ADI, as compared to AlarMax, without any identification of the specific products compared, the respective prices and sale dates of the products sold to each, or any analysis of whether there was a permissible basis for the pricing differential. Again, the 2004 Agreement does not prohibit lower net pricing; only exclusive low pricing. *See also* FOF ¶¶ 64-84 (demonstrating unreliability of Gilden's opinion).

18.     This Court likewise is not bound by Judge Maureen Kelly's ruling in the 2014 AlarMax v. Honeywell case regarding the interpretation and operation of Section 1.2 within the 2011 ADI Vendor Agreement.

19.     As an initial matter, the instant lawsuit involves a different entity (Resideo) that was not a party to the AlarMax v. Honeywell case, and Judge Kelly's ruling regarding the interpretation of Section 1.2 addressed the behavior of Honeywell, not Resideo.

20.     Moreover, as outlined in the findings of fact, there have been a number of developments since Judge Kelly issued her opinion that also justify this Court revisiting the issue. *See, e.g,* FOF ¶¶ 47-51, 85-94 (noting, *inter alia*, ADI's sending of clarification letters to AlarMax's top 15 overlapping vendors in November 2019 explaining that ADI was not seeking exclusive price arrangements in its vendor agreements; approval of those letters was approved by AlarMax as part of its 2019 Settlement Agreement with Honeywell, signifying AlarMax's concurrence with the substance of the letters; and ADI's amendment by 2024 of the challenged pricing language of the 2011 Vendor Agreement with a new Section 1.2 that made clear that ADI was not requiring or requesting, exclusive low prices to the exclusion of other competing distributors, such as AlarMax).

21. When an action seeks declaratory relief, federal courts have the discretion to decline jurisdiction under the Declaratory Judgment Act because such actions seek an adjudication of rights and obligations prior to the enforcement of a remedy. Rarick v. Federated Serv. Ins. Co., 852 F.3d 223, 227 (3d Cir. 2017).

22. Even if AlarMax could establish the applicable jurisdictional thresholds, the Court declines to exercise its discretion to issue a declaratory judgment in a purely state-law matter such as this involving, at best, a hypothetical disagreement regarding the applicability of a decades old Agreement to a non-party to that agreement, in the absence of any credible evidence of past or continued adversity involving that party. See, e.g., Noven Therapeutics, LLC v. Actavis Lab'ys FL, Inc., No. CV 14-6414 (FSH), 2015 WL 9918412, at *1 (D.N.J. Feb. 20, 2015) ("Even if a sufficient justiciable controversy has been alleged, however, the Court may decline declaratory judgment jurisdiction as a matter of discretion. . . . Discretion to decline declaratory judgment claims 'enable[s] the court to make a reasoned judgment whether the investment of judicial time and resources in a declaratory action will prove worthwhile in resolving a justiciable dispute.'" (citations omitted)); Web.com, Inc. v. Fed. Ins. Co., No. 2:06CV1032, 2007 WL 4377609, at *2 (W.D. Pa. Dec. 11, 2007) ("[A]pplicable Third Circuit and Supreme Court 'precedents counsel hesitation by federal courts in exercising jurisdiction over declaratory judgment actions when the state law involved is close or unsettled.' And where the state law is firmly established, there is even less reason for resort to the federal courts." (citing Summy, 234 F.3d at 135)).

23. Based on the foregoing Findings of Fact and Conclusions of Law, an Order will issue directing the Clerk to dismiss the Complaint and close the case. AlarMax's request for declaratory judgment is DENIED.

IT IS SO ORDERED.


December 31, 2025                              s/Cathy Bissoon
                                              Cathy Bissoon
                                              Chief United States District Judge


cc (via ECF email notification):

All counsel of record